

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00535-CV

_____

IN THE INTEREST OF E.A., C.A., L.A., AND E.A., CHILDREN

---

On Appeal from the 324th District Court
Tarrant County, Texas
Trial Court No. 324-575667-15

---

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

After a bench trial, the trial court terminated Appellant Father's and Appellant Mother's parental rights to their four children, Andrew, Barry, Charles, and Diane.[1] For Father and Mother, the trial court found grounds under Subsections (D) (endangering conditions or surroundings), (E) (endangering conduct), and (O) (failure to comply with court-ordered service plan) of Section 161.001(b)(1). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O). For Father, the trial court additionally found grounds under Subsection (N) (constructive abandonment) of Section 161.001(b)(1). *See id.* § 161.001(b)(1)(N). And for both Father and Mother, the trial court found that termination was in the children's best interest under Section 161.001(b)(2). *See id.* § 161.001(b)(2). Both Father and Mother appealed.

In one issue, Father contends that the evidence is legally and factually insufficient to support the trial court's finding that termination was in the children's best interest. Generally, Father argues that because the Texas Department of Family and Protective Services had not succeeded in placing the children in one foster placement and because the Department had not found an adoptive placement for any of the children, the trial court should have opted for the status quo, not termination.

---

[1]To protect the children's identities, we use aliases when referring to them and refer to their family members by their relationship to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

As for Mother, in three points, she argues that the evidence is insufficient to support (1) the trial court's Subsections (D) and (E) findings; (2) the trial court's Subsection (O) finding; and (3) the trial court's best-interest finding. Mother argues generally that Father domestically abused her, not the children, and that terminating her parental rights based on Father's domestic violence just further victimizes her.

Because legally and factually sufficient evidence supports the trial court's (D) and (E) grounds, we overrule Mother's first point. Because our disposition of Mother's first point makes her second point moot, we do not address it. *See* Tex. R. App. P. 47.1. And because legally and factually sufficient evidence supports the trial court's best-interest findings, we overrule Father's issue and Mother's third point. Based on these rulings, we affirm the trial court's judgment terminating Father's and Mother's parental rights.

## II. BACKGROUND

Father and Mother had four children: Andrew, Barry, Charles, and Diane, who were thirteen, eleven, ten, and seven years old, respectively, at the time of trial in November 2024. As shown below, (A) after a domestic violence incident in July 2023, the Department initiated Family-Based Safety Services (FBSS), but in November 2023, Mother tested positive for methamphetamines, and later that same month, the safety plan failed; (B) the Department removed the children, after which, Father refused to participate in services and Mother's participation was negligible; as for the children, the Department was not able to place them in the same foster home

3

but had to split them up with the two older children going into a group home and the two younger children going into a foster home, and as of the time of trial, the Department had not found an adoptive placement for any of the children; and (C) notwithstanding the Department's inability to place the children together in the same foster home and to find an adoptive home for any of them, the trial court signed a judgment terminating both Father's and Mother's parental rights.

## A. The FBSS Case

Sixteen months before the November 2024 trial, in July 2023, Father engaged in domestic violence against Mother and was arrested. The incident had two consequences: first, Father was indicted, and second, the Department became involved in Father's, Mother's, and the children's lives.

### 1. Indictment

In May 2024, the State indicted Father for the third-degree felony of assault on a family or household member with a prior conviction for an assault on a family or household member. *See* Tex. Penal Code Ann. § 22.01(b)(2). In the indictment, the State alleged that Father had intentionally, knowingly, and recklessly caused bodily injury to Mother by twisting and pulling her arms and fingers, by pushing her body into a wall and a dresser with his hands, and by pulling her hair.[2] The alleged prior

---

[2]The November 2023 removal affidavit indicated that while the children were present, Father held a gun to Mother's head. This allegation did not appear in the May 2024 indictment, but the allegation resurfaced in the Department's September 2024 "Permanency Report to the Court." The State did not introduce into evidence

conviction was a 2016 order of deferred adjudication for aggravated assault on a family or household member.[3]

Regarding the prior case involving domestic violence, the Department introduced into evidence documentation regarding the 2016 order of deferred adjudication. In 2016, Father pleaded guilty to a 2015 aggravated assault against Mother, a family or household member, by intentionally, knowingly, and recklessly causing bodily injury to her by striking her with his hand and by grabbing and

_____

the removal affidavit or the permanency report at trial, but both are part of the trial court's record.

Regarding the clerk's record and any reliance that we place thereon, just before the Department rested, at the Department's request, the trial court took judicial notice—without objection—of its file: "The Court will take judicial notice of its file and four Texas Vital Statistics forms from the Texas Department of State Health Services, all filed on 12/21/23 regarding [Charles, Andrew, Barry, and Diane]." We construe the trial court to have taken judicial notice of its entire file. *See In re Est. of Downing*, 461 S.W.3d 231, 239–40 (Tex. App.—El Paso 2015, no pet.). "Absent some indication that the content judicially noticed went beyond the permissible bounds, we cannot presume error." *In re C.J.*, No. 02-24-00197-CV, 2024 WL 3387348, at *2 (Tex. App.—Fort Worth July 12, 2024, no pet.) (mem. op.). Some of the documentation within the file contained factual assertions that were "subject to reasonable dispute" and were—if objected to—not within the proper parameters of judicial notice. *See* Tex. R. Evid. 201. The removal affidavit's and the permanency report's assertions that Father held a gun to Mother's head is one example. "[A]s with other evidence-admissibility issues, any error in taking judicial notice must be preserved in the court below." *C.G. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00019-CV, 2022 WL 2069128, at *4 (Tex. App.—Austin June 9, 2022, pet. denied) (mem. op.). For our purposes, we will rely on the evidence presented at trial but will occasionally note what the documentation in the court's file reflects.

[3]For purposes of Section 22.01 of the Texas Penal Code, deferred adjudication counts as a prior conviction regardless of whether the defendant successfully completes his community supervision. *See* Tex. Penal Code Ann. § 22.01(f)(1).

squeezing her neck. Father further admitted that during the commission of the assault, he used and exhibited a deadly weapon, a knife. *See id.* § 22.02(a)(2). The trial court placed Father on deferred-adjudication community supervision for four years. Father completed his community supervision, and the trial court dismissed the case in 2020.

### 2. Department's Involvement

Turning to the Department's involvement with the family after the July 2023 domestic violence incident, FBSS, which was part of the Department, started working with Father and Mother.[4] FBSS offers services to families to address any concerns regarding child abuse or neglect and, in the process, to hopefully prevent Child Protective Services (CPS) from removing the children. This was not Father and Mother's first FBSS case. Father and Mother had twice previously been offered

---

[4]"Family-based safety services are protective services provided to a family whose children are not in the conservatorship of the Department . . . ." 40 Tex. Admin. Code Ann. § 700.710. The Department's "Child Protective Services Division provides family-based safety services to families and children . . . to: (1) protect the children from abuse and neglect; (2) help the family reduce the risk of future abuse or neglect; and (3) prevent the removal of the children from their home." *Id.*; *In re E.M.*, No. 11-24-00248-CV, 2025 WL 625764, at *3 n.2 (Tex. App.—Eastland Feb. 27, 2025, no pet. h.) (mem. op.); *In re B.A.*, No. 02-21-00278-CV, 2022 WL 247558, at *1 n.4 (Tex. App.—Fort Worth Jan. 27, 2022, pet. denied) (mem. op.). If the parents do not participate in services to address dangers to the children, the Department will consider seeking removal of the children. 40 Tex. Admin. Code Ann. § 700.718, .722; *In re J.M.*, No. 02-21-00346-CV, 2022 WL 872542, at *1 n.3 (Tex. App.—Fort Worth Mar. 24, 2022, no pet.) (mem. op.).

domestic violence services. Although Father did not comply with the services, Mother did, so the earlier cases were closed.

The FBSS caseworker, Ashley Jones, said that Mother had mental deficiencies and was often confused, so Jones had to rely on Maternal Grandmother to clarify things for Mother. Jones believed that with Maternal Grandmother's help, Mother understood what was happening: "I was very clear, and . . . I made sure that she understood what I was telling her and our concerns."

FBSS offered Father and Mother services at SafeHaven. SafeHaven provides a domestic violence curriculum.[5]

Father did not participate in those services because Jones could not locate him. As for Mother, she told Jones that she had started but not completed those services, but SafeHaven indicated to Jones that Mother had not even started its services.

As part of the FBSS safety plan, Father and Mother had to be supervised at all times when they were around the children. The supervisor was Maternal Grandmother. But between September 29, 2023, and October 4, 2023, Mother left Maternal Grandmother's home with the children and would not tell FBSS where or

---

[5]"SafeHaven is a nonprofit organization that serves domestic violence victims, has two emergency domestic violence shelters, and operates 24/7 hotlines." *Powell v. State*, No. 02-19-00206-CR, 2021 WL 5370163, at *7 n.19 (Tex. App.—Fort Worth Nov. 18, 2021, pet. ref'd) (mem. op. on reh'g, not designated for publication); *see In re M.H.*, No. 02-22-00048-CV, 2022 WL 2840266, at *3 (Tex. App.—Fort Worth July 21, 2022, no pet.) (mem. op.); *Kingsbury v. State*, 625 S.W.3d 686, 697 (Tex. App.—Fort Worth 2021, no pet.); *In re A.S.*, No. 02-18-00235-CV, 2019 WL 237561, at *3 (Tex. App.—Fort Worth Jan. 17, 2019, pet. denied) (mem. op).

with whom she and the children had been. The Department suspected, however, that Mother and the children had been with Father.

Also on October 4, 2023, one of Jones's coworkers contacted Father. Father informed FBSS that he would not cooperate with the Department.

Notwithstanding Mother's having the children for six days without Maternal Grandmother's supervision, FBSS sought to implement another safety plan involving Maternal Grandmother. Jones explained that FBSS was still willing to work with Maternal Grandmother because she had notified it immediately after Mother had left with the children.

But about six weeks later, on November 17, 2023, FBSS learned that Mother might be using methamphetamines. When tested, Mother's results were positive for methamphetamines and amphetamines. Mother admitted that she had been using methamphetamines for three years and was pessimistic about her ability to stop. Mother did not say if she used drugs with anyone else, and she acknowledged that while the safety plan was in place, she had left the house at nighttime to use drugs.

Based on this new development, FBSS offered Mother drug treatment at a hospital. Mother was supposed to go to the hospital for an inpatient drug assessment, which generally took several days, but she left the same day that she reported, and the

hospital never sent FBSS any results. Mother did not follow up on any other drug-treatment options, such as Recovery Resource.[6]

Meanwhile, on November 20, 2023, Maternal Grandmother informed FBSS that it would need to find another placement for Mother and the children because Maternal Grandmother feared retaliation from Father. Efforts to find another placement failed. Mother was not able to provide any other viable family-placement options. Father suggested Paternal Grandmother, but FBSS determined that she had a CPS history involving a removal for domestic violence.

Later, on November 29, 2023, when Jones was talking to Mother on the phone, Jones overheard a conversation in the background during which someone else used Father's nickname, and when Jones confronted Mother about whether she was with Father, Mother admitted that she was. Jones spoke with Father, but he denied any domestic violence. Jones, however, was aware that Father had a 2015 domestic-violence case that, Jones said, had occurred in front of the children.

Then, on November 30, 2023, having no family-placement options for the children, Jones went to court and requested a removal, which the court granted.

---

[6]The trial court and the parties would be familiar with the reference to Recovery Resource. For those readers not familiar with the reference, the Recovery Resource Council is a nonprofit behavioral healthcare provider in North Texas whose mission is to "promote wellness and recovery from disorders relating to alcohol, substance use, trauma, and mental health." Recovery Resource Council, https://recoverycouncil.org (last visited April 4, 2025). It seeks to help, among others, "adults struggling with substance abuse, trauma, and mental health." *Id.*

**B. After the Removal**

After the children were removed, a permanency specialist with Our Community Our Kids (OCOK) developed a service plan for both Father and Mother. OCOK is a private provider of community-based care that contracts with the Department in Tarrant County and other Texas counties; it provides foster-care case management and kinship- and family-reunification services.[7] In July 2024, Jian Neniel, was assigned the case.[8]

**1. Father**

Father was asked to complete parenting classes, a substance-abuse intake, random drug testing, individual counseling, a batterers' intervention and prevention program, and a psychological evaluation. Father did not sign up for parenting classes, did not complete his substance-abuse assessment, did not complete individual counseling, did not start or complete the batterers' intervention and prevention program, and did not complete his psychological evaluation.

Since July 2024, Father had been in custody at least once in the Dallas County Jail—sometime between September and October 2024—but had subsequently been

---

[7]*In re S.G.*, No. 02-24-00045-CV, 2024 WL 1792764, at *3 n.5 (Tex. App.—Fort Worth Apr. 25, 2024, pet. denied) (mem. op.).

[8]Neniel's testimony focused primarily on what occurred while she was Father and Mother's caseworker.

released.[9]  Father told Neniel that he had completed his psychological evaluation and his individual counseling while he was in jail, but Neniel had not been able to verify that information.

Neniel had asked Father to complete drug testing between July and October. But Father did not cooperate.

Since July 2024, Father had not attended any visits with his children.  Before July 2024, he had visited the children only twice.  Neniel asserted that Father had not regularly visited or maintained significant contact with any of his children during the case.

Neniel said that Father could not currently provide the children with a safe environment.  She explained that this was because she did not know where he lived to verify whether his home was safe and because Father and Mother had a history of not having stable homes.  Father would not respond to Neniel's requests for information regarding his residence.

According to Neniel, Father had not provided her with any safe or appropriate family members with whom the Department could place the children.  Neniel had

---

[9]Father's May 2024 indictment for assaulting Mother is from Dallas County. Whether this reference to Father's incarceration in the Dallas County Jail was related to that indictment was not explained.  In Mother's brief, she relies on the Dallas County jail records to provide more detail.  Because this information was not provided to the trial court, we will not consider it.  *See Marshall v. Hous. Auth. of City of San Antonio*, 198 S.W.3d 782, 789 (Tex. 2006) ("[W]e do not consider factual assertions that appear solely in briefs and are not supported by the record.").

contacted a paternal great aunt, among other relatives, but she was not successful in finding a family placement.

Neniel asked the court to terminate Father's parental rights on four grounds:

- Father had knowingly placed the children or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being;

- Father had engaged in conduct that endangered the children's physical and emotional well-being;

- Father had constructively abandoned the children because he had not regularly visited them, the children had been in the Department's care more than six months, the Department had made reasonable efforts to return the children to the parents, Father had not regularly visited or maintained significant contact with the children, and Father was not able to provide the children with a safe environment; and

- Father had failed to comply with a court-ordered family-service plan.[10]

### 2. Mother

Neniel agreed that Mother had mental deficiencies, but she denied that Mother did not understand the proceedings or the service plan: "[Mother] understands things. You just need to explain it a little more slowly and more thoroughly."

As part of her services, Mother needed to complete parenting classes, a substance-abuse assessment and the services recommended in conjunction with the assessment, random drug testing, individual counseling, a psychological evaluation, and SafeHaven intake. Mother had started parenting classes but had not started any

---

[10]Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O).

other services.  Neniel had asked Mother to be drug tested, but Mother had never complied.

From July through November 2024, Mother attended only three or four scheduled visits with the children.[11]  Mother had a virtual visit one week before trial.  Because Mother attended so few visits, Neniel did not believe that she had maintained significant contact with the children.

Since a week before trial, Mother was living with Maternal Great-Grandmother.  But before that, Neniel did not know where Mother was living.  Neniel had concerns because Maternal Great-Grandmother had indicated that she did not want the children.  Neniel did not believe that Mother could provide the children with a safe home environment.

Mother did not appear for trial.  Neniel said that Mother was aware of the trial and understood that the Department was seeking to terminate her parental rights.

Because (1) Mother admitted drug use, (2) Neniel believed—based on working with the family—that domestic violence had occurred with the children present and that domestic violence would continue to occur with the children present if Mother's parental rights were not terminated, (3) domestic violence was a condition or surrounding that could endanger the children, and (4) Mother had not participated in family-planned services or shown behavioral changes addressing the concerns present

---

[11]The visits were scheduled weekly.

at removal for substance abuse and domestic violence, Neniel asked the court to terminate Mother's parental rights based on three grounds:

- Mother knowingly placed the children or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being;

- Mother had engaged in conduct that endangered the children's physical and emotional well-being; and

- Mother's failure to comply with the court-ordered family plan.[12]

### 3. Father and Mother

Neniel thought that it was in the children's best interest to terminate Father's and Mother's parental rights. When asked why the Department was seeking termination, Neniel responded, "The parents are not addressing the concerns present at the removal, and these kids need a home as soon as possible. Just a safe, stable, loving home."

### 4. The Children's Placements

Neniel said that the Department's policy was to place siblings together, and the Department had tried to place Andrew, Barry, Charles, and Diane together but without success. Additionally, none of the children were currently in an adoption-motivated home.

---

[12]*Id.* § 161.001(b)(1)(D), (E), (O).

Andrew and Barry were together in one placement. They were in a group home. For Andrew and Barry, the group home was their second placement. Both were doing well in the group home.

Charles and Diane were in a foster home together, but that foster home was not willing to adopt. A different foster family—a family that had provided respite care for Charles and Diane—was considering adopting them. Throughout the case, Charles and Diane had been in the same placement.

The Department was broadcasting the children for adoption. If possible, the Department wanted the same family to adopt all four. The Department was, however, considering placing the two younger children with an adoptive family, which would result in the siblings being split up. Neniel noted, however, that when splitting up siblings was a possibility, the Department asked potential adoptive families about their willingness to maintain contact with the children's other siblings.

The children were visiting one another every week for an hour and were bonded. Neniel said that throughout the case, one of the children's primary concerns was having these visits and maintaining their sibling bond. Neniel summarized, "I think it would be best if they were together. But realistically, if we can only find separated homes, that's what is best for them."

Given that the Department did not have a long-term placement plan in place, Father's attorney asked Neniel if "it would be best to give these parents a fighting chance to work some services"? Neniel answered, "No." She explained that—when

the FBSS case was included—the parents had already had over a year to address the various concerns and had not done anything. In Neniel's opinion, giving the parents additional time would not change anything, would harm the children, and was not fair to the children.

Regarding the children's special needs, Andrew and Charles had mild intellectual disabilities. Andrew's group home was addressing his disability, and Charles received special education services. Due to these intellectual disabilities, both Andrew and Charles might require continued services past their eighteenth birthdays. Charles also had fairly severe asthma, but since coming into care, his asthma had been managed well. Barry and Diane had no specific needs. All four children participated in individual and play therapy, and all four had done well in their therapy and counseling.

At the close of the trial, the trial court asked for and received a report from the children's guardian ad litem (GAL). The GAL reported that Charles and Diane were in "a very good placement" and that the foster parents had "stayed on top" of Charles's asthma. The GAL noted that Charles received special education services, that the foster mother was a special educator, and that she had been "very hands on." As for Andrew and Barry, they were doing well in their group home.

The GAL asserted that she had discussed the possibility of termination with the children and related that they were open to adoption. The GAL explained that the children's "primary concern continues and has always been sibling access." The

16

GAL continued, "They very much want to maintain the sibling bond, and that is their top concern and has been from the beginning." On the other hand, the GAL noted, "they still do want to maintain their relationship with their parents."

## C. The Judgment

On grounds for termination, the trial court found that both parents had

- knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, *see* Tex. Fam. Code Ann. § 161.001(b)(1)(D);

- engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being, *see id.* § 161.001(b)(1)(E); and

- failed to comply with the provisions of a court order that specifically set out the actions needed for Father and Mother to obtain the return of the children, who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from the parents for abuse or neglect of the children, *see id.* § 161.001(b)(1)(O).

For Father, the trial court also found that

- Father had constructively abandoned the children who had been in the permanent or temporary managing conservatorship of the Department for not less than six months and (1) the Department had made reasonable efforts to return the children to Father, (2) Father had not regularly visited or maintained significant contact with the children, and (3) Father had shown an inability to provide the children a safe environment. *See id.* § 161.001(b)(1)(N).

The trial court also found that termination of both Father's and Mother's parental rights was in the children's best interest. *See id.* § 161.001(b)(2).

17

# III. DISCUSSION

## A. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds listed in Family Code Section 161.001(b)(1), and (2) termination is in the child's best interest under Section 161.001(b)(2). *Id.* § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged findings to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see* Tex. Fam. Code Ann. § 161.001(b)(2). We assume that the factfinder settled any evidentiary conflicts in favor of its findings if a reasonable factfinder could have done so. *J.P.B.*, 180 S.W.3d at 573. We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the findings. *Id.* That is, we consider evidence favorable to the findings if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.

*See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

In determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the termination of parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002).

## B. Grounds

Father does not contest the trial court's findings concerning the grounds for termination. Mother, however, does. The trial court found grounds against Mother under Subsections (D), (E), and (O) of Section 161.001(b)(1). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O). Mother attacks the (D) and (E) findings in her first point and the (O) finding in her second point.

## 1. Grounds (D) and (E)

### a. Applicable Law

To endanger a child means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *In re G.F.*, No. 02-21-00267-CV, 2022 WL 524138, at *3 (Tex. App.—Fort Worth Feb. 22, 2022, pet. denied) (mem. op.). To endanger encompasses a substantial risk of harm to the child, but it means more than a threat of metaphysical injury or the potentially ill effects of a less-than-ideal family environment. *In re J.S.*, 687 S.W.3d 541, 549–50 (Tex. App.—Eastland 2024, no pet.).

Under Subsection (D), we examine evidence about the child's environment to determine if it endangered the child's physical or emotional well-being. *In re C.W.*, No. 02-23-00414-CV, 2024 WL 637264, at *3 (Tex. App.—Fort Worth Feb. 15, 2024, pet. denied) (mem. op.); *G.F.*, 2022 WL 524138, at *3. A Subsection (D) finding may be based on a single act or omission. *In re M.G.*, No. 02-23-00074-CV, 2023 WL 4008687, at *6 (Tex. App.—Fort Worth June 15, 2023, pet. denied) (mem. op.) (citing *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)).

Under Subsection (E), we ask whether evidence shows that the parent's conduct—or the conduct of a person with whom the parent knowingly leaves a child—endangered the child's physical or emotional well-being. *Id.* at *6 (citing *In re E.M.*, 494 S.W.3d 209, 221 (Tex. App.—Waco 2015, pets. denied)); *G.F.*, 2022 WL 524138, at *3. "[T]ermination under [S]ubsection (E) must be based on more than a

20

single act—there must be a voluntary, deliberate, and conscious course of conduct by the parent." *In re R.H.*, 693 S.W.3d 846, 856 (Tex. App.—Fort Worth 2024, pet. denied). The behavior need not be directed at the child. *G.F.*, 2022 WL 524138, at *3. Courts may consider conduct that occurred outside the child's presence or after the Department removed the child. *In re C.L.-F.*, No. 02-22-00021-CV, 2022 WL 2353091, at *2 (Tex. App.—Fort Worth June 30, 2022, no pet.) (mem. op.).

### b. Grounds (D) and (E) Analysis

Mother's conduct, as well as the children's environment and surroundings in which they lived while with Mother, endangered the children's physical and emotional well-being for at least two reasons. First, she used illegal drugs. And second, she remained with Father notwithstanding the domestic violence.

Mother admitted using illegal drugs for about three years. Because illegal drug use exposes children to the possibility that the parent may be impaired or imprisoned, it may support termination. *See J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In re E.J.H.*, No. 07-22-00074-CV, 2022 WL 2346631, at *1 (Tex. App.—Amarillo June 29, 2022, pet. denied) (per curiam) (mem. op.) (holding evidence sufficient where parent had drug issues and had failed to prove that she had suitable housing or employment); *In re I.I.T.*, 648 S.W.3d 467, 475–76 (Tex. App.—San Antonio 2021, no pet.) (holding evidence legally and factually sufficient under (E) where parent had drug issues, was unemployed, and had questionable housing);

21

*Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Mere imprisonment will not, standing alone, constitute engaging in conduct that endangers the physical or emotional well-being of a child. . . . However, when all of the evidence, including imprisonment, shows a course of conduct . . . endangering the physical or emotional well-being of the child, a finding under [Subsection (E)] is supportable."). Mother's assertion that she did not use drugs in the children's presence—assuming the factfinder believed her—does not mitigate against an endangerment finding. *See In re A.J.Z.*, No. 04-20-00218-CV, 2020 WL 5913845, at *4 (Tex. App.—San Antonio Oct. 7, 2020, no pet.) (mem. op.) ("[The parent's] drug use, even if not the immediate cause of the children's removal and even if done outside of their presence, presented an emotional and physical danger to the children, negatively affected the stability of [the parent's] home, weighed on the children's emotional and physical needs, and indicated an improper parent-child relationship.").

As for the domestic violence, Father pleaded guilty to an act of domestic violence against Mother in 2016 for an act committed in 2015. Despite that, Mother remained with Father and even had a fourth child with him—Diane was born in December 2016. Father committed another act of domestic violence in July 2023. This latter incident prompted the FBSS case and the safety plan that required Maternal Grandmother to supervise Mother and Father when they were with the children. Despite the plan, Mother left with the children for six days in September

22

and October 2023 and refused to tell FBSS where or with whom the children had been. Later, during a November 2023 phone call, Mother admitted being with Father. "A parent's decision to continue living with someone who has committed instances of domestic violence may support an endangerment finding under Subsection (D)." *M.G.*, 2023 WL 4008687, at *6 (citing *In re M.V.*, 343 S.W.3d 543, 547 (Tex. App.—Dallas 2011, no pet.)). "Generally, conduct that subjects a child to a life of uncertainty and instability endangers the [child's] physical and emotional well-being . . . ." *In re B.K.*, No. 02-21-00175-CV, 2021 WL 5848769, at *8 (Tex. App.—Fort Worth Dec. 9, 2021, pet. denied) (mem. op.).

Although there were only two documented cases of domestic violence, that did not mean that there were not others or would not be others. The trial court could draw adverse inferences from Mother's and Father's failure to testify at trial.[13] *See In re I.D.*, No. 05-21-00244-CV, 2021 WL 4236878, at *8 (Tex. App.—Dallas Sept. 17, 2021, pet. denied) (mem. op.) ("Father's failure to testify allowed the trial judge to draw an adverse inference on this relevant subject that was within Father's personal knowledge."); *In re Cummings*, 13 S.W.3d 472, 477 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.) ("From this incident of family violence, the trial court may have inferred that [the perpetrator] was likely to commit family violence again.").

---

[13]Mother failed to appear for trial. Father appeared but did not testify. The record is silent on whether Father invoked his Fifth Amendment right not to incriminate himself. *See* U.S. Const. amend. V.

The factfinder may consider domestic violence and a propensity for violence as evidence of endangerment, even if the violence did not occur in the children's presence, was not directed at the children, or did not physically injure the children. *In re M.S.*, 662 S.W.3d 620, 630 (Tex. App.—Beaumont 2023, pet. denied). Abusive or violent conduct by a parent can produce an environment endangering the children's physical or emotional well-being. *Id.* Although aware of Father's violence, Mother continued to expose herself to it and would expose the children to it. *See In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards.").

Whether viewing the evidence in the light most favorable to the judgment or weighing all the disputed evidence, a reasonable factfinder could have formed a firm belief or conviction that Mother's conduct, as well as the children's environment and surroundings in which they lived while with Mother, endangered the children's physical and emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 18–19.

We overrule Mother's first point.

### 2. Ground (O)

Because we have found the evidence legally and factually sufficient to support grounds under (D) and (E), we need not address Mother's complaint as to the third

ground, (O).  *See* Tex. R. App. P. 47.1; *In re M.K.*, No. 02-19-00459-CV, 2020 WL 1949629, at *7 (Tex. App.—Fort Worth Apr. 23, 2020, no pet.) (mem. op.).

## C. Best Interest

Both Father and Mother attack the best-interest findings—Father in his sole issue and Mother in her third point.  In addition to grounds (D) and (E), the Department had to prove that termination was in the children's best interest.  *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803.

### 1. Applicable Law

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).  Evidence that is probative of the predicate grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2).  *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *In re B.H.R.*, 535 S.W.3d 114, 123 (Tex. App.—Texarkana 2017, no pet.).  We also consider the evidence in light of the following nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

• the programs available to assist these individuals to promote the child's best interest;

• the plans for the child by these individuals or by the agency seeking custody;

• the stability of the home or proposed placement;

• the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

• the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re Z.G.*, No. 02-23-00038-CV, 2023 WL 3521848, at *4 (Tex. App.—Fort Worth May 18, 2023, pet. denied) (mem. op.); *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *7 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.).

## 2. Best-Interest Analysis

Father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination was in the children's best interest. Specifically, he argues (1) the Department had not found an adoptive placement for any of the children, and for two children, the Department had not even found a foster home but had, instead, placed them in a group home; (2) no evidence suggested that

Father had ever abused any of the children; (3) given the children's ages, they were likely to remain in the Department's care until they turned eighteen years old; and (4) the trial court could have opted for a middle ground by not terminating his parental rights, by awarding permanent managing conservatorship to the Department, and by having him continue to work services so that the children could continue to see him.

Mother—in her third point—also argues that insufficient evidence supports the trial court's best-interest finding. She argues that she was the victim of Father's domestic violence and that Father's domestic violence was what precipitated this case. Thus, she contends that terminating Father's parental rights and returning the children to her—where they would, without Father's presence, be safe—was in the children's best interest.

With Father's and Mother's arguments in mind, we address the *Holley* factors. As shown below, the first factor neither favors nor disfavors termination. But all the remaining factors support the best-interest finding.

### a. The Children's Desires

Neither the Department nor the parents presented any evidence of the children's desires.

The evidence regarding Father's and Mother's bond, if any, with the children is scant.[14] Since the removal, Father had visited the children only twice. In contrast to Father, Mother did visit the children, but from July to November, she visited them only three or four times; she missed more visits than she made. Neither the Department nor the parents presented any testimony regarding how those visits went.

On the other hand, the GAL's report to the court indicated that the children wanted to maintain a relationship with their parents but were, nevertheless, open to adoption. The children's primary concern was continued sibling contact.

On balance, the evidence would not give the factfinder much to weigh for or against termination. *See In re M.M.*, No. 02-23-00139-CV, 2023 WL 5202870, at *5 (Tex. App.—Fort Worth Aug. 14, 2023, no pet.) (mem. op.) ("The record reflects that [the child] appeared to be happy during the times when she was in [the f]ather's care, but it also reflects that she had a father–daughter relationship with [her step-father]. . . . We conclude that this factor is neutral and does not weigh against or in favor of the trial court's best-interest finding.");[15] *In re J.R.*, No. 02-18-00317-CV, 2019 WL 237740, at *10 (Tex. App.—Fort Worth Jan. 17, 2019, pet. denied) (mem. op.) (holding that "this factor weighed neither for nor against" the termination of the

---

[14]The September 2024 "Permanency Report to the Court" states that Andrew, Barry, and Charles enjoyed seeing their parents. As for Diane, the report indicated that she "likes spending time with her mother . . . at the weekly visits."

[15]*M.M.* was in the context of a private termination case. *Id.* at *1.

father's parental rights when the child did not testify at trial, the record did not otherwise reflect the child's desires regarding placement, and the child was bonded with both the father and the foster parents).

### b. The Children's Emotional and Physical Needs Now and in the Future

Andrew and Charles had mild intellectual disabilities that might require continued services after their eighteenth birthdays. Charles also had fairly severe asthma. All four children needed a safe and stable home—a paramount consideration in assessing the best interest of any child. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at \*18 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.).

Because Father was, for the most part, absent during the case, refused to cooperate with the Department, and did not testify at trial, the record is silent on how he could meet the children's emotional and physical needs now and in the future. Father nevertheless argues that this factor weighs in his favor based on two other considerations.[16] First, he notes that the Department had not found an adoptive placement for any of the children and that the Department had not even found a foster home for Andrew and Barry but had, instead, placed them in a group home.

---

[16]Father advanced four arguments. We address his two remaining contentions under other factors.

29

And second, given the children's ages, Father argues, they were likely to remain in the Department's care until they turned eighteen years old.

Regarding the children's current placements, the two older children, Andrew and Barry, were in a group home, and the two younger children, Charles and Diane, were in a foster home. The children were happy in these placements, and the placements were meeting the children's needs.[17] And although the Department had not yet found an adoptive home or homes for the children, it was actively searching for one.

The Department was thus making efforts to ensure the children's current and future safety and stability. Given the paucity of Father's efforts to meet the children's emotional and physical needs while the case was pending and, in contrast, the Department's efforts to meet those needs not only during the case but also in the future, a reasonable factfinder could have found this evidence weighed clearly and convincingly in favor of termination. *See In re R.J.*, 579 S.W.3d 97, 115 (Tex. App.— Houston [1st Dist.] 2019, pet. denied) ("The parents' minimal visitation and lack of an

---

[17]The September 2024 "Permanency Report to the Court" indicated that the children were doing well in their placements. "[Andrew] stated that he is happy and that his basic needs are met." "[Barry] is doing well in his current placement. . . . [Barry] stated that he is happy and that his basic needs are met." "[Charles] is doing well in his current placement with his sister [Diane], and they both state that they like their foster parents." "[Charles] states that all his basic needs are being taken care of." "[Diane] is doing well in her current placement with her brother [Charles], and they both state that they like their foster parents." "[Diane] is doing well in her current placement. . . . [Diane] states that all her basic needs are being taken care of. [Diane] says that she loves it at the current placement with her brother and foster parents."

emotional bond with [the child] is relevant not only to [their] parental abilities but also to the emotional and physical needs of [the child] now and in the future and to determining whether the parent-child relationship is not a proper one.").

Turning to the children's adoption prospects, no party presented evidence regarding the likelihood of the children remaining in the Department's care until their eighteenth birthdays because the Department was not able to place them for adoption. Father appears to argue that because adoption was not likely, termination served no purpose. Assuming without deciding that adoption was not likely, it does not necessarily follow that termination was pointless.

The "ultimate goal" of termination is "ensuring the safety and stability of the child." *Walker*, 312 S.W.3d at 622. A State's interest in finding an alternative permanent home for a child arises only when it is clear that the parent cannot or will not provide a normal family home for the child. *Santosky v. Kramer*, 455 U.S. 745, 767, 102 S. Ct. 1388, 1402 (1982). "[I]n a parental-rights termination case, the goal of litigation is to protect the safety, health, and welfare of the child, and to accomplish that goal, the Department seeks to completely sever the parent-child relationship forever." *In re K.D.*, 471 S.W.3d 147, 169 (Tex. App.—Texarkana 2015, no pet.). "The goal of establishing a stable, permanent home for a child is a compelling government interest." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Consequently, even when the Department may not be able to

place the children for adoption, termination may nevertheless be in the children's best interest.

As for Mother, in her brief, she acknowledged that Andrew and Charles would need future services for their intellectual impairment, but she also noted that Barry and Diane would not. Regardless, she did not address how she could meet any of the children's current or future needs. Because Mother currently lived with Maternal Great-Grandmother and because Maternal Great-Grandmother indicated that she did not want the children, a reasonable factfinder could have concluded that Mother was not able to meet the children's emotional and physical needs.

### c. The Emotional and Physical Danger to the Children Now and in the Future

Father argues that no evidence suggested that he had ever physically abused the children.[18] Although the record does not show that Father physically abused the children, that fact is not dispositive. The factfinder may consider domestic violence and a propensity for violence as evidence of endangerment, even if the violence did not occur in the children's presence, was not directed at the children, or did not physically injure the children. *M.S.*, 662 S.W.3d at 630. Abusive or violent conduct by a parent can produce an environment endangering the children's physical or emotional well-being. *Id.* "Domestic violence, want of self-control, and propensity

---

[18]This is one of Father's two remaining arguments.

for violence may be considered as evidence of endangerment." *In re S.A.*, 665 S.W.3d 59, 70 (Tex. App.—Tyler 2022, pet. denied) (mem. op.).

In addition to domestic violence, Father endangered the children's emotional and physical well-being in other ways. For example, he refused to engage in services to address the domestic-violence concern. "A court may consider a parent's failure to complete a service plan as part of the endangering conduct analysis." *Id.* at 71. And Father's visiting the children only twice while the case was pending is another example. "[A] trial court may consider in its analysis a parent's failure to visit, which can endanger the child's emotional well-being." *In re J.G.*, No. 02-21-00257-CV, 2022 WL 187983, at *9 (Tex. App.—Fort Worth Jan. 20, 2022, no pet.) (mem. op.) (citing *M.K.*, 2020 WL 1949629, at *6); *In re R.A.G.*, 545 S.W.3d 645, 652 (Tex. App.—El Paso 2017, no pet.) ("[A] fact finder may infer that a parent's lack of contact with the child and absence from the child's life endangered the child's emotional well-being."). A factfinder could have found this evidence to weigh heavily in favor of termination.

Turning to Mother, she asserts that Father was the source of endangerment, that she was the victim of Father's abuse, and that terminating her rights based on Father's conduct would only compound her victimization.[19] A reasonable factfinder,

---

[19]A supreme court concurring opinion articulates the tension between being a victim of domestic abuse and terminating the victim's parental rights based on the abuse:

however, could wholly agree with Mother that she was the victim of Father's domestic violence but fault her for remaining with Father. The first known incident occurred in 2015, and the most recent known incident occurred in 2023. The evidence showed that even after the 2023 removal, Mother was with Father. Although aware of Father's violence, she continued to expose herself and would expose the children to it. *See E.R.W.*, 528 S.W.3d at 264 (stating that when an environment is dangerous and the parent disregards the danger, the child is endangered).

Domestic violence was not, however, the only concern. Mother tested positive for methamphetamines and amphetamines, admitted having taken them for three

---

> While this case can only come out one way, placing such emphasis on this mistaken factor [(being the victim of domestic abuse)] could lead to improper judgments in future cases. I fear that this approach is just shy of deeming a mother's status as a victim to be in and of itself sufficient to warrant termination.
>
> . . . .
>
> This is not to say that the victimization of a parent could not lead to circumstances that are linked to relevant and probative bases for a best-interest analysis. The problem is in cutting corners and inadvertently converting a parent's status as an abuse victim into a de facto basis for termination. For example, Daughter's own safety might be in question if Mother's safety was in jeopardy—something that might be true regardless of how well Mother could disguise her injuries. Likewise, knowingly or repeatedly placing Daughter in a position where she would likely observe serious violence against anyone (the parent or someone else) would clearly warrant the State's protection and likely termination of parental rights.

*In re A.P.*, 672 S.W.3d 132, 137 (Tex. 2023) (Young, J., concurring).

years, acknowledged that getting off of them would be difficult, refused drug tests after initially testing positive, and refused to get drug treatment. A parent's use of illegal drugs and the drugs' effect on the parent's ability to care for the children may qualify as endangering conduct; drug use exposes a child to the possibility that the parent may be impaired or imprisoned. *T.D. v. Tex. Dep't of Fam. & Protective Servs.*, 683 S.W.3d 901, 913 (Tex. App.—Austin 2024, no pet.); *Walker*, 312 S.W.3d at 617 ("Because [illegal drug use] exposes the child[ren] to the possibility that the parent may be impaired or imprisoned, [it] may support termination . . . ."). Mother's refusal to take drug tests only underscored the problem: "A parent's refusal to submit to drug tests permits the trial court to presume that the drug test would have been positive." *L.C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-24-00322-CV, 2024 WL 4375803, at *5 (Tex. App.—Austin Oct. 3, 2024, no pet.) (mem. op.); *In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *4 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.) (stating that the trial court could have reasonably inferred from the mother's failure to attend scheduled drug screenings that she was avoiding testing because she was using drugs.). Mother's drug use—regardless of whether it occurred in the children's presence—and her refusal to address her drug problem endangered the children. *See In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.) ("Courts may further consider parental conduct that did not occur in the child's presence, including conduct before the child's birth or after [the child] was removed from a parent's care.").

A reasonable factfinder could have found this factor to weigh heavily in favor of termination.

### d.  The Parental Abilities of the Individuals Seeking Custody

Father did not present any evidence of his parental abilities.  From Father's failure to visit the children regularly, however, the factfinder could have inferred that Father had poor parenting abilities.  *See In re G.C.S.*, 657 S.W.3d 114, 134–35 (Tex. App.—El Paso 2022, pet. ref'd) (stating that the factfinder could infer that the father's failure to visit the child throughout the case was evidence of poor parenting abilities).

Mother, for her part, asserts that there was no evidence of her parenting abilities; Mother argues that the trial court should not have held Father's abusive conduct against her.  The trial court, however, did not have to restrict its review strictly to Father's abuse.  The trial court could also consider Mother's not taking advantage of SafeHaven's domestic-violence program and her remaining with Father despite the domestic violence.  Those factors reflected poorly on her parental abilities. *See In re L.W.*, 609 S.W.3d 189, 205 (Tex. App.—Texarkana 2020, no pet.) ("The trial court could have believed [that] Mother's inability to stay in one domestic violence program and her poor judgment in repeatedly returning herself and her children to her abuser . . . established a lack of parental abilities . . . .").

Apart from Mother's remaining with Father, Mother had another concern that she failed to address: her drug use.  *See In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—

Houston [1st Dist.] 2023, pet. denied) ("A continuing pattern of illegal drug use . . . will support a finding that termination of parental rights is in a child's best interest.").

As for the Department, it found a group home for Andrew and Barry and a foster home for Charles and Diane. Foster parents receive training before fostering children. *See, e.g., In re R.W.*, No. 05-21-01158-CV, 2022 WL 2236087, at *6 (Tex. App.—Dallas June 22, 2022, no pet.) (mem. op.) (noting that foster parents received training and had to be licensed); *In re S.A.S.*, No. 01-18-00393-CV, 2018 WL 6613865, at *8 (Tex. App.—Houston [1st Dist.] Dec. 18, 2018, pet. denied) (mem. op.) ("[The foster parents] successfully completed the training, study, and other requirements necessary to become licensed foster parents.").

The Department was seeking an adoptive home or adoptive homes for all the children. And before proceeding with an adoption, a court must, with limited exceptions, have prospective adoptive parents evaluated. *See* Tex. Fam. Code Ann. § 107.153 (requiring an evaluation of prospective adoptive parents). Even after children are placed for adoption, there is effectively a six-month probationary period. *See id.* § 162.009 ("The court may not grant an adoption until the child has resided with the petitioner for not less than six months."); *Catholic Charities of Diocese of Galveston, Inc. v. Harper*, 337 S.W.2d 111, 114 (Tex. 1960) ("Even after placement, preceded by a careful and personal investigation of the character, environment, health, financial responsibility[,] and other qualifications of the prospective adoptive parents, the child is to live in their home for a period of six months before adoption may be

granted except in cases of emergency."); *In re J.W.*, No. 02-23-00047-CV, 2024 WL 125362, at \*2 (Tex. App.—Fort Worth Jan. 11, 2024, no pet.) (mem. op.) ("Before a trial court may grant an adoption, the child must have resided for at least six months with the person seeking the adoption.").

Consequently, while the children are in the Department's care and when children are placed for adoption, efforts are made to ensure that their guardians have the proper parental abilities. Thus, a reasonable factfinder could have weighed this factor heavily in favor of termination.

### e. The Programs Available to Assist These Individuals to Promote the Children's Best Interest

Andrew and Charles had mild intellectual disabilities. Andrew's group home helped him with his disability, and Charles received special education. The caseworker asserted that both might need continued services after their eighteenth birthdays. All four children were participating in individual and play therapy. Thus, the Department took advantage of services to promote the children's best interest. In contrast, when services were made available to Father and Mother, neither took advantage of them.

The availability of services, however, brings us to Father's last argument. Father argues that the trial court should have opted for a middle ground by not terminating his parental rights and by awarding permanent managing conservatorship

to the Department so that he could continue to work services and so that the children could continue to see him.

With the right facts, this argument has met with some success in the case law. *See C.C. v. Tex. Dep't of Fam. & Protective Servs.*, 653 S.W.3d 204, 221–22 (Tex. App.— Austin 2022, no pet.) (holding that where parent and child were closely bonded; where parent's substance-abuse issues could be mitigated by maintaining the Department as the child's managing conservator; where Department had no prospective adoptive homes; where primary argument in favor of termination was that termination might facilitate finding an adoptive home; and where, notwithstanding termination, the trial court allowed parent continued visitation with child, insufficient evidence supported the finding that termination was in child's best interest); *In re I.B.*, No. 13-17-00098-CV, 2017 WL 2806779, at *10–11 (Tex. App.—Corpus Christi–Edinburg June 29, 2017, no pet.) (mem. op.) (holding that where parent's behavior alone was not egregious enough to merit termination; where children had been moved frequently; where the Department "admittedly was unable to adequately meet" the children's needs; where the Department had—with the exception of one child—no concrete plans for more permanent placements; and where parent had been willing to work services, no reasonable factfinder could have formed a firm believe or conviction that terminating parent's rights was in the children's best interest).

Father's facts, however, are distinguishable from both *C.C.* and *I.B.* Unlike the parent and the child in *C.C.*, who had a bond, our record does not show that Father

had a bond with his children. He visited them only twice after their removal. The children's primary concern was seeing one another. This distinguishes Father's case from C.C. Furthermore, the record does not show that, if given more time, Father would visit the children. And unlike the parent in *I.B.*, Father was not willing to work any services to help him promote the children's best interest. Nothing suggested that Father would work services if he were given more time. This distinguishes Father's case from *I.B.*

On our record, a reasonable factfinder could have found that not terminating Father's parental rights and keeping the Department as the children's managing conservator for the purpose of enabling Father to work services and to continue visiting his children was pointless. A reasonable factfinder could have reasonably concluded that this factor favored termination. *See In re K.O.*, 488 S.W.3d 829, 841 (Tex. App.—Texarkana 2016, pet. denied) (stating that a mother's failure to take advantage of all of the Department's services and to complete her family service plan weighed in favor of terminating the mother's parental rights.).

As for Mother, she asserts this factor has no bearing because there was no evidence of the available programs. But, like Father, a reasonable factfinder could have noted that the Department had offered Mother many services to address the various concerns, but Mother had not taken advantage of them. "A fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of her child that she does not have the ability to motivate herself to

40

seek out available resources needed now or in the future." *In re T.C.*, No. 01-17-00497-CV, 2018 WL 4126600, at \*25 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pet. denied) (mem. op.). Thus, for Mother too, a reasonable factfinder could conclude that this factor weighs in favor of termination.

### f. The Plans for the Children by These Individuals or by the Agency Seeking Custody and the Stability of the Home or Proposed Placement[20]

Father presented no evidence of what he would do if the children were returned to him. The Department was not able to determine where he lived or how he supported himself.

Mother similarly presented no evidence of what she would do if the children were returned to her. There was no evidence that Mother worked. The evidence showed that Mother was dependent on Father, Maternal Grandmother, or Maternal Great-Grandmother for housing. But Maternal Grandmother was no longer an option due to her fear of Father. Maternal Great-Grandmother was not an option either because she did not want the children. And Father was not an option because he posed a danger to both Mother and the children.

Although Mother asserted that terminating Father's parental rights would mean the children could be safely returned to her, a factfinder could have reasonably questioned this proposition. While the FBSS case was pending, Mother—who was

---

[20]We consider these two *Holley* factors together.

not supposed to have the children while unsupervised—left with the children for six days in late September and early October 2023 and was suspected of taking them to see Father. So having a safety plan in place was no guarantee that Mother would follow it.

In contrast, the Department had managed to provide the children stable—although not permanent—homes that were safe. Charles and Diane had been in the same foster home since their removal while Andrew and Barry had been in two placements. Additionally, the Department was seeking adoption for all four children, preferably together, but if that was not possible, separately but with the possibility of maintaining contact.

A factfinder could have reasonably concluded that these two factors favored termination. *See In re U.G.G.*, 573 S.W.3d 391, 403 (Tex. App.—El Paso 2019, no pet.) ("After comparing [the father's] plan with . . . the Department and foster family['s], the trial court could have reasonably found that the Department's plan [wa]s more realistic and [that] allowing [the child] to remain with the foster family offer[ed] him the permanency and stability he would not have with [the father].").

42

### g. The Parents' Acts or Omissions that May Indicate that the Existing Parent–Child Relationship is Not a Proper One and the Parents' Excuses, If Any, for the Acts or Omissions[21]

Three reasons show that the relationship between Father and the children was not a proper one.

The first was domestic violence. Father denied that he had engaged in domestic violence. But he pleaded guilty to committing an aggravated assault against Mother in 2016 and was under indictment for assaulting her again in 2023. Although Father's 2023 offense was still pending at the time of trial, the trial court could still consider it. *See S.A.*, 665 S.W.3d at 70–71 ("Criminal acts that also constitute domestic violence need not lead to indictment or conviction in order to be considered under the family code."). Thus, the factfinder could still consider the most recent assault when determining best interest.

Second, Father showed little interest in the children after their removal. From November 2023 until November 2024, he visited the children twice. "A parent's failure to regularly visit with a child, a typical requirement of a service plan and a requirement of the service plans in this case, also endangers the child's well-being." *In re D.A.*, No. 02-22-00260-CV, 2022 WL 17841133, at *7 (Tex. App.—Fort Worth Dec. 22, 2022, pet. denied) (mem. op.). "[A] trial court may consider in its analysis a parent's failure to visit, which can endanger the child's emotional well-being." *In re*

---

[21]We consider the last two *Holley* factors together.

*I.B.*, No. 02-21-00358-CV, 2022 WL 1257133, at *5 (Tex. App.—Fort Worth Apr. 28, 2022, no pet.) (mem. op.). Father provided no reason for not visiting his children.

Third, Father compromised his availability to parent the children when his conduct resulted in a new felony indictment. Father had a third-degree felony indictment pending and faced incarceration for up to ten years and not less than two years. *See* Tex. Penal Code Ann. § 12.34(a). Should Father go to prison, he advanced no safe placement option for the children. Mother was living with Maternal Great-Grandmother, but placing the children with Maternal Great-Grandmother was not an option. The Department looked for but was not able to find viable family placements. *See In re L.D.C.*, 622 S.W.3d 63, 73 (Tex. App.—El Paso 2020, no pet.) (stating that the father's proposed family placement while he was in prison was not viable because the family member had relinquished custody of the child due to the father's disruptive behaviors).

Turning to Mother, the evidence also showed that her relationship with the children was not a proper one. Mother had mental deficiencies. "A parent's mental issues are relevant to her ability to provide care for her child's needs—physical and emotional—throughout the child's life, which clearly goes to best interest." *In re L.G.*, No. 04-15-00038-CV, 2015 WL 4113620, at *3 (Tex. App.—San Antonio July 8, 2015, no pet.) (mem. op.); *see In re D.W.*, 353 S.W.3d 188, 197 (Tex. App.—Texarkana 2011, pet. denied) ("[R]egardless of the reasons (even though apparently entirely beyond [the mother's] control) for her acts or omissions, they still exist and must be

44

considered in determining the best interest of the child."). Here, Mother's mental deficiencies were coupled with domestic violence and illegal drug use, and Mother did not show that she had the wherewithal to address either issue.

As to both parents, a reasonable factfinder could have found that these two factors strongly favored termination.

### h. Best-Interest Ruling

Viewing the evidence in the light most favorable to the trial court's best-interest findings, we hold that a factfinder could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between Father and Mother and their four children—Andrew, Barry, Charles, and Diane—was in the children's best interest, and we thus hold that the evidence is legally sufficient to support the trial court's best-interest findings. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. And based on our exacting review of the entire record and giving due deference to the factfinder's findings, we also conclude that the evidence is factually sufficient to support the trial court's best-interest findings. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Father's sole issue and Mother's third point.

## IV. CONCLUSION

Having overruled Father's sole issue and Mother's first and third points and having determined that resolving Mother's second point is unnecessary, we affirm the trial court's judgment.

45

/s/ Dana Womack

Dana Womack
Justice

Delivered:  April 10, 2025